UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **CHANDRE' CHANEY**<br>         **Plaintiff** | **CIVIL ACTION NO. 3:22-cv-00016** |
| versus | JUDGE _____ |
| **BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE THROUGH LOUISIANA STATE UNIVERSITY HEALTH SCIENCES CENTER**<br>         **Defendant** | MAGISTRATE JUDGE _____ |

## COMPLAINT

**NOW INTO COURT,** through undersigned counsel, comes Plaintiff, Chandre' Chaney, who respectfully represents as follows:

### Parties

1.     Plaintiff, Chandre' Chaney ("Ms. Chaney"), is a person of the full age of majority of the United States and the State of Louisiana who at all times relevant to this litigation resided within this judicial district.

2.     The Defendant named herein is the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, a political subdivision of the State of Louisiana, through Louisiana State University Health Sciences Center ("LSUSHC"), Jurisdiction

3.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331 and §1343, as Plaintiff's action asserts claims of race discrimination, wrongful termination, and retaliation under Title VII of the Civil Rights Act and 42 U.S.C. §1981.

1

## Venue

4. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because: (i) the Defendant has its principal business establishment within this district.

## Procedural Requirements

1. Before commencing this action, Ms. Chaney filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging violations of Title VII.

2. Ms. Chaney filed the charge with the EEOC on or around November 10, 2020, within 180 days of the occurrence of the alleged employment practices that violated Title VII.

3. Ms. Chaney's EEOC charge arose out of the same facts alleged herein.

4. On October 19, 2021, the EEOC issued Ms. Chaney a Notice of Right to Sue. Ms. Chaney is filing this complaint within ninety (90) days of receiving that Notice of Right to Sue.

## Factual Allegations

**Ms. Chaney's Employment with Louisiana State University Health Sciences Center**

1. Ms. Chaney is a former employee of LSUHSC. Ms. Chaney worked for LSUHSC from September 1, 2019 through September of 2020.

2. LSUHSC hired Ms. Chaney on September 1, 2019 to serve as a Program Manager for the Louisiana Cancer Prevention ("LCP") & Control Programs.

3. Ms. Chaney's assignment was to work for the Colorectal Cancer Grant.

4. Ms. Chaney reported to Dr. Randi Kaufman ("Dr. Kaufman"), the Assistant Director of the LCP and the Principal Investigator of the Colorectal Cancer Grant.

5. When Ms. Chaney was hired, Donna Williams ("Ms. Williams") was the Director of the LCP. Ms. Chaney reported to Ms. Williams during the last month of her employment.

6. When Ms. Chaney was hired, Jasmine Meyer ("Ms. Meyer") was employed as a Program Manager of the Breast and Cervical Program at LSUSHC.

7. When Ms. Chaney was hired, Natalie Hollingshed ("Ms. Hollingshed") was employed as an Administrative Program Specialist A at LSUSHC.

8. When Ms. Chaney was hired, Laura Ricks ("Ms. Ricks") was employed as Communications Manager at LSUSHC.

9. When Ms. Chaney was employed with LSUSHC, Whitney Marmer ("Ms. Marmer") was also a member of the communications team.

10. When Ms. Chaney was hired, Toya Shanklin ("Ms. Shanklin") was employed as a Business Manager I at LSUSHC.

11. Upon hire, Ms. Chaney had supervisory responsibility over Ms. Megan Fraser ("Ms. Fraser") and Nick Payne ("Mr. Payne"). Mr. Payne was a Data & Evaluation Specialist. Ms. Fraser was a Practice Facilitator.

12. When Ms. Chaney was employed with LSUSHC, Scott Embley ("Mr. Embley") was employed as a Campus Assistance Program counselor.

13. When Ms. Chaney was employed with LSUSHC, Simone DeDeaux ("Ms. DeDeaux") was employed as the Manager of Employee Relations.

14. When Ms. Chaney was employed with LSUSHC, Cori Higginson ("Ms. Higginson") was employed as the Human Resources Director.

15. When Ms. Chaney was employed, the dean of the School of Public Health was Dean Dean G. Smith ("Mr. Smith").

16. When Ms. Chaney was employed, Amee Barattini ("Ms. Barattini") was the Assistant Dean for Finance and Administration of the School of Public Health.

17. Ms. Chaney received satisfactory performance reviews during her employment at LSUHSC. She was a diligent employee who excelled at her job duties.

18. On August 11, 2020, LSUSHC notified Ms. Chaney that her employment would end on September 10, 2020. Ms. Kaufman informed Ms. Chaney that her position was being eliminated due to budgetary issues.

**LSUSHC's Discriminatory Treatment and Harassment of Ms. Chaney:**

1. As outlined below, LSUSHC violated Title VII by subjecting Ms. Chaney to a hostile work environment because of her race.

2. Ms. Chaney was discriminated against, mistreated, and harassed because of her race by employees at LSUSHC, including without limitation: Dr. Kaufman, Ms. Williams, Ms. Fraser, and Mr. Payne.

3. Ms. Chaney is an African American woman.

4. When Ms. Chaney was hired, her assigned office was the office assigned to the previous Colorectal Manager, a Caucasian person. This office was located on the same hallway as the other Program Managers and the Director, all of whom are Caucasian employees. On Ms. Chaney's first day of work, Ms. Chaney was given a different office, located on the opposite side of the building from other LCP team members and away from her team. The office of the previous Colorectal Manager was given to a different Caucasian manager.

5. Leadership team meetings were held on a regular basis on Tuesdays.

6. In October of 2019, Ms. Chaney and Ms. Hollingshed, who is also an African America woman, asked for the key to the storage room housing the inflatable colon that they were responsible for signing out to community partners. The communications manager Laura Ricks, a Caucasian woman, would not give Ms. Chaney and Ms. Hollingshed the key they needed, explaining that there was "expensive equipment" in the room. Ms. Chaney brought this up in a leadership team meeting shortly after but was cut off from speaking, even though the

communications manager was allowed to share her side of the matter. After the leadership team meeting, Ms. Chaney's supervisor Dr. Kaufman told Ms. Chaney that everyone knew the communications manager, Mr. Ricks, was racist, but there was nothing Dr. Kaufman could do about it.

7. Beginning in October of 2019 and continuing until the end of Ms. Chaney's employment, Ms. Megan Fraser would not cooperate with or support Ms. Chaney or other African American staff members. Ms. Fraser left Ms. Chaney's name off projects and documents that Ms. Chaney played a major role creating. Ms. Fraser did not interact with Natalie Hollingshed (another African American woman) on planning webinars, as her job duties entailed. Ms. Fraser avoided this other African American woman and left her off of planning meetings and emails.

8. In November of 2019, Ms. Chaney was told that her employees didn't trust her and that she needed to "build trust" with her employees. Ms. Chaney asked if there were instances where she acted or spoke in an untrustworthy manner, but none were provided.

9. During her employment, at a leadership team meeting, Ms. Chaney was asked if she had smoked marijuana before and if she had ever been to jail.

10. During a period of remote work at her employment, at a teleconference meeting, Ms. Chaney's co-workers told her they were "surprised" that her house was "so nice." They expressed similar surprise at how "nice" the house of another African American employee, Ms. Shanklin, appeared on camera to be "nice."

11. During her employment at LSUSHC, Ms. Chaney noted that Caucasian employees and African American employees were treated differently with regard to leave. Caucasian employees did not always have to submit leave time, but African American staff members were required to submit time off requests and wait for approval.

5

12. During her employment at LSUSHC, Ms. Chaney noticed that African American staff members could not question wrongdoing or mistreatment without reprimand and retaliation. African American staff members were tasked with taking on extra work or duties outside of their job descriptions while Caucasian staff members were not. For example, an African American questioned her manager about duties being added to her job again in violation of civil service rules that prohibited the practice. The staff member was told by her Caucasian manager, "There's the door, you can leave."

13. During her employment, Ms. Chaney noticed that the personal and health information of African American staff members was being improperly disclosed. Ms. Chaney learned about another African American staffer's post-traumatic stress disorder ("PTSD") from ongoing jokes about the staff's in a leadership team meeting. The visa status of an immigrant staff member from Nigeria was frequently referenced as well.

14. During her employment, Ms. Chaney noticed that different practice about conducting personal business during work hours were enforced based on the race of staff members. For instance, Ms. Meyer, a Caucasian woman, was allowed to promote and sell her personal farm's business products, while Ms. Hollingshed, an African American woman, was told that she violated LSUSHC's policy against advertising, selling or promoting personal business at work when she shared the details of her aunt's meal menu with her coworkers.

15. During her employment, Ms. Chaney noticed that job openings were given to friends of Caucasian staff members, whether or not they were qualified. Additionally, promotions and raises tended to be given to Caucasian staff members rather than their African American counterparts, regardless of performance or length of tenure.

16. During her employment, Ms. Chaney was asked to share sensitive budget documents with Mr. Payne and Ms. Fraser, though other Caucasian managers were not asked to share these types of documents with the employees they supervised. Mr. Fraser and Ms. Payne provided offensive feedback to Ms. Chaney in person and through email, which Ms. Chaney shared with Ms. Williams and Ms. Kaufman. Ms. Williams and Ms. Kaufman supported Mr. Payne's and Ms. Fraser's comments in these budget choice exchanges.

17. In November of 2019, Dr. Kaufman and Ms. Williams shared in a leadership team meeting that they had an implicit bias against African American people.

18. When Ms. Chaney reported she had difficulties working with Ms. Fraser in November 2019, Ms. Kaufman suggested that she visit the Campus Assistance Program ("CAP"), a counseling center for employees

19. In December of 2019, Ms. Chaney and Ms. Shanklin, both African American women, were asked to manage another African American woman, Ms. Hollingshed, even though Ms. Hollingshed's duties did not fall under either woman's supervisory roles. Ms. Chaney was told that Ms. Hollingshed's previous manager, who was Caucasian, said that Ms. Hollingshed was "difficult to work with" even though Ms. Hollingshed had not been disciplined regarding the issue. At the time, Ms. Chaney and Ms. Shanklin were told they were being asked to manage Ms. Hollingshed because they "seemed cool with her" and had "things in common with her."

20. In January of 2020, an African American staff member who had been employed seventeen (17) years won civil service awards. This African American was not properly compensated until Civil Service required LSU to pay this employee an increase in salary.

21. In January of 2020, Ms. Chaney asked a Caucasian employee that she supervised to provide a doctor's note after the employee missed five days of work and was told "people don't

like being asked for proof." However, Ms. Chaney and other African American staff members were often reminded that they needed to bring a doctor's note upon their return to work when they were out sick.

22. On February 21 of 2020, Dr. Kaufman wrote an email to Ms. Chaney and other staff members and attached a PDF about Caucasian supremacy titled "Caucasian Supremacy Culture Okun." Dr. Kaufman wrote in the body of the email, "Interesting read. I see our program and myself in this. Let's talk about [sic] on a Tuesday." The PDF included a list of characteristics of Caucasian supremacy culture that show up in organizations, including defensiveness, power hoarding and fear of conflict.

23. In April of 2020, Mr. Payne transitioned to working in a new role on Ms. Meyer's team. He continued to report to Ms. Chaney.

24. By May 18 of 2020, Mr. Payne stopped sending Ms. Chaney weekly reports and began sending his weekly reports to only Ms. Meyer and Ms. Shanklin. During this period, Mr. Payne was late to, or absent from, several team meetings.

25. In May of 2020, Ms. Chaney asked the two Caucasian women on the communications team, Ms. Ricks and Ms. Marmer, to complete a small task for the colorectal team. The communications team was given three weeks' notice, but told Ms. Chaney they did not have time to complete the small task. This request was brought up at the next leadership team meeting, but Ms. Williams would not allow Ms. Chaney to share her side of the story in the leadership team meeting. However, Communications Manager Ms. Ricks was allowed to speak and share her side.

26. On June 1, 2020, Ms. Chaney asked for Mr. Payne's weekly report via email. Mr. Payne replied that he did not report to Ms. Chaney and asked about the purpose of Ms. Chaney's

record keeping. During this same time frame, Mr. Payne removed weekly check-ins with Ms. Chaney from his work calendar. Ms. Chaney shared these actions with Ms. Meyer and Dr. Kaufman and was verbally told "he must be going through something."

27.     Ms. Chaney forwarded Mr. Payne's email to Ms. Kaufman on June 2, 2020. Ms. Kaufman replied that Ms. Chaney did not need Mr. Payne's records. Ms. Chaney wrote back that she did need the records and that she did not feel the need to explain everything to Mr. Payne. Ms. Kaufman replied that Ms. Chaney did not "have to explain everything." Ms. Kaufman also added, "And you [sic] almost done with him." Ms. Chaney replied that she was exhausted by the exchange and that she was looking "forward to hiring someone new." Ms. Kaufman replied "K." From that point forward, Mr. Payne continued to send his reports to Ms. Shanklin and Ms. Meyer, and Ms. Meyer would forward the reports to Ms. Chaney.

28.     In June of 2020, Ms. Chaney was referred again to the CAP. Ms. Kaufman told Ms. Chaney she was being referred to the CAP so that Ms. Chaney could learn how to deal with difficult colleagues. Ms. Chaney began seeing a counselor through the program.

29.      In June of 2020, Dr. Kaufman told Ms. Chaney that she was an "angry black woman." Dr. Kaufman instructed Ms. Chaney to take emotional intelligence courses, so Ms. Chaney enrolled in two emotional intelligence courses. Ms. Chaney completed the emotional intelligence courses I & II by June 25, 2020.

30.     As outlined below, Ms. Chaney engaged in protected activity when reporting racial discrimination in the workplace, and LSUSHC retaliated by terminating her employment.

31.     On June 8, 2020, during Ms. Chaney's initial counseling session, CAP counselor Scott Embley referred Ms. Chaney to Employee Relations so that Ms. Chaney could share her experiences of being treated poorly because of her race. Mr. Embley stated this was a Employee

9

Relations issue rather than a CAP issue. Ms. Chaney met with Ms. DeDeaux, Manager of Employee Relations, on June 11, 2020.

32. On June 10, 2020, Dr. Kaufman asked Ms. Chaney about her meetings with CAP, though the content of these meetings is protected by law. Ms. Kaufman became upset when Ms. Chaney shared that the CAP counselor referred her to Employee Relations.

33. From June of 2020 through September of 2020, Ms. Chaney continued to meet with Mr. Embley. Both Mr. Embley and Ms. DeDeaux documented Ms. Chaney's experiences by taking notes during the meetings. Ms. DeDeaux concluded that an investigation needed to be opened to learn more about possible racial discrimination at LCP. However, Human Resources Director, Ms. Higginson, declined to open an investigation into whether racial discrimination was taking place at LCP.

34. In July of 2020, Ms. Fraser filed a false Human Resources claim against Ms. Chaney that stated Ms. Chaney was supervised by Ms. Fraser, that Ms. Fraser couldn't work with Ms. Chaney much longer, and that Ms. Chaney needed to be fired. The organizational chart from this period indicated that Ms. Chaney supervised Ms. Fraser. Ms. Fraser's claim was closed because it was false. To Ms. Chaney's knowledge, Ms. Fraser was not reprimanded for making a false claim against Ms. Chaney.

35. In August of 2020, Ms. Chaney was told that Ms. Williams, the director, was her new manager, rather than Ms. Kaufman, the Assistant Director. This change in supervision was made even though the colorectal manager had always reported to the assistant director in past management structures. During this time, Ms. Chaney requested to take sick leave. Approval of Ms. Chaney's sick leave was delayed, which caused her added stress during an already difficult

time. Ms. Chaney noticed that managers took longer to approve the sick leave requests of AfricanAmerican staff members than of their Caucasian peers.

36. On August 11, 2020, Ms. Chaney was given 30 days' notice of termination.

37. Ms. Shanklin typically prepares termination documents for the LCP. However, Ms. Barattini prepared Ms. Chaney's termination paperwork. Ms. Shanklin was asked by Dr. Kaufman to review Ms. Chaney's termination letter for proper legal terminology the morning of August 11.

38. In August of 2020, when news of Ms. Chaney's termination was shared, a Caucasian staff member asked Ms. Chaney if she was going to "get on food stamps" and sign up for Medicaid.

39. In August of 2020, Dr. Kaufman shared with Ms. Shanklin that Ms. Chaney's termination was all Ms. Williams' fault as Ms. Williams did not care for Ms. Chaney.

40. In September of 2020, Ms. Chaney met with Mr. Smith and told him how she had been treated after she reported treatment that she perceived as racial discrimination. Ms. Chaney also shared the details of her termination with Mr. Smith. Mr. Smith replied that he had been "hearing things about LCP." Mr. Smith told Ms. Chaney that he would investigate the matter, but Ms. Chaney did not hear anything further from him. Ms. Chaney also suggested that Mr. Smith speak to Ms. Shanklin. Mr. Smith responded that Ms. Shanklin was uncomfortable talking to him about issues because she feared retaliation.

**Demand for Relief for Race Discrimination, Wrongful Termination, and Retaliation in Violation of Title VII of the Civil Rights Act and 42 U.S.C. §1981**

1. Ms. Chaney restates and re-alleges paragraphs 1-40 and incorporates them herein.

2. At all relevant times hereto, Ms. Chaney was an "employee" within the meaning of Title VII and 42 U.S.C. §1981.

3. At all relevant times hereto, LSUSHC was an "employer" within the meaning of Title VII and is subject to 42 U.S.C. §1981.

4. By virtue of the foregoing, the LSUSHC violated Title VII and 42 U.S.C. §1981 by discriminating against Ms. Chaney because of her race (African American).

5. As outlined above, LSUSHC violated Title VII and 42 U.S.C. §1981 when it wrongfully terminated Ms. Chaney in retaliation for engaging in protected activities.

6. As outlined above, LSUSHC further violated Title VII and 42 U.S.C. §1981 by subjecting Ms. Chaney to a hostile work environment because of her race.

7. As a result of the LSUSHC's unlawful acts, Ms. Chaney has suffered damages of a pecuniary and non-pecuniary nature. Ms. Chaney has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, and loss of enjoyment of life, for which Ms. Chaney is entitled to an award of damages, attorney's fees, and costs.

8. The Plaintiff respectfully demands trial by jury.

**WHEREFORE**, Plaintiff, Ms. Chaney, respectfully requests that this Honorable Court enter judgment in her favor and against Defendant, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College through Louisiana State University Health Sciences Center, awarding her all compensatory damages, back pay, reinstatement or front pay in lieu thereof, reasonable attorneys' fees, litigation expenses and costs, and for such other and further relief this Court deems just and equitable.

Respectfully Submitted;

*/s/ J. Arthur Smith, III*_____
J. ARTHUR SMITH, III, (#07730)
**SMITH LAW FIRM**
830 North Street
Baton Rouge, Louisiana 70802
Telephone: (225) 383-7716
Facsimile: (225) 383-7773
jasmith@jarthursmith.com
*Attorney for Plaintiff, Chandre' Chaney*