**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

CHANDRE' CHANEY                                              CIVIL ACTION

versus                                                       22-CV-16-SDD-EWD

BOARD OF SUPERVISORS OF LOUSIANA STATE
UNIVERSITY AND AGRICULTURAL AND MECHANICAL
COLLEGE

<u>**RULING**</u>

This matter comes before the Court on the *Motion for Summary Judgment* filed by
Defendant Board of Supervisors of Louisiana State University and Agricultural and
Mechanical College (the "Defendant").[1] Chandre' Chaney (the "Plaintiff") submitted an
*Opposition*[2] and Defendant submitted a *Reply*.[3] For the reasons that follow, Defendant's
Motion for Summary Judgment will be granted.

**I.    BACKGROUND AND PROCEDURAL FACTS**

**A.  Plaintiff is hired at LSUHSCNO.**

Plaintiff, a Black female, became an employee of the Louisiana State University
Health Science Center New Orleans (the "LSUHSCNO") on September 1, 2019.[4] Plaintiff
was hired as a Program Manager for the Louisiana Colorectal Health project, within the
Louisiana Cancer and Prevention Control Program (the "LCP").[5] Her role was funded by
a grant (the "Colorectal Grant") obtained through the Centers for Disease Control and

---

[1] Rec. Doc. No. 24.
[2] Rec. Doc. No. 38.
[3] Rec. Doc. No. 41.
[4] Rec. Doc. No. 24-1, p. 1.
[5] *Id*. at p. 2.

Prevention (the "CDC").[6] She was interviewed and hired by Dr. Donna Williams ("Dr. Williams"), Director of the LCP, and Dr. Randi Kaufman ("Dr. Kaufman"), Assistant Director of the LCP and the Principal Investigator[7] of the Colorectal Grant.[8] Dr. Williams and Dr. Kaufman are also professors at the School of Public Health.[9] They are both White females.[10]

LSUHSCNO also employed four other managers in the LCP: Jasmine Meyer ("Meyer"), a White female; Mikal "Mack" Giancola ("Giancola"), a White male, Laura Ricks ("Ricks"), a White female, and Toya Shanklin-Jackson ("Shanklin-Jackson"), a Black female.[11] Like the Plaintiff, Meyer and Giancola are program managers.[12] Ricks is the Communications Manager and Shanklin-Jackson is the Business Manager of the LCP.[13]

At the beginning of her employment, Plaintiff supervised Megan Fraser ("Fraser"), a White female, and Nick Payne ("Payne"), a White male.[14] Fraser, Payne, Meyer, Ricks, and Giancola were all previous students of Dr. Williams and Dr. Kaufman before working in the LCP.[15]

---

[6] *Id.*
[7] This term is undefined by the parties. The Court's research reveals that the term is defined as "[t]he individual(s) designated by the applicant organization/recipient [of a grant] to have the appropriate level of authority and responsibility to direct the project or program to be supported by the award." *See Dictionary of Terms*, Ctrs. of Disease Control and Prevention, https://www.cdc.gov/grants/dictionary/index.html#p (Feb. 23, 2022).
[8] Rec. Doc. No. 24-1, p. 2.
[9] *Id.*
[10] *Id.*
[11] *Id.* at p. 3.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.* at p. 4.

### B.  The Giant Inflatable Colon

Plaintiff's first alleged incident of racial harassment involved a giant inflatable colon (the "Colon").[16] The Colon is an interactive display for guests of the LCP. Guests walk through the Colon to see what the inside of a colon looks like.[17] When not in use, the Colon was stored in LCP employee, Whitney Marmer ("Marmer")'s office.[18] On October 8, 2019, Plaintiff emailed Marmer, Ricks, Giancola, and Shanklin-Jackson asking if she and another LCP employee, Natasha Hollingshed ("Hollingshed"), could make a set of keys for Marmer's office so that they could retrieve and return the Colon without Marmer's assistance.[19] Hollingshed is also a Black female.[20] Marmer responded stating, "[m]y office is storing some expensive equipment, so I'd lean towards not making more keys for that door."[21] She then stated that other building employees have master keys and that she was open to relocating the Colon to Plaintiff's office. Giancola responded and suggested a meeting to discuss the access issue.[22] Ricks then responded stating that she experienced the same issue accessing materials from Hollingshed's office, and similarly noted that they could find a building employee who had a master key.[23] Hollingshed and Ricks proceeded to exchange emails on the issue, but ultimately, Marmer agreed that Plaintiff and Hollingshed could have keys made to access her office.[24] However, after these exchanges, Plaintiff decided she no longer wanted the key because she did not

---

[16] *Id*. at p. 5.
[17] *Id*.
[18] *Id*.
[19] *Id*.
[20] *Id*.
[21] Rec. Doc. No. 24-15, Ex. I, p. 12.
[22] *Id*. at p. 10.
[23] *Id*. at p. 9.
[24] Rec. Doc. No. 24-1, p. 5-6.

want "the pressure" if anything were to happen to the "expensive equipment" in Marmer's office.[25]

Subsequently, all the managers attended an in-person meeting to discuss the "key situation." The entire management team was present, as well as Dr. Williams and Dr. Kaufman.[26] During the meeting, Ricks, Shanklin-Jackson, Meyer, and Dr. Kaufman spoke on the situation.[27] However, when Plaintiff attempted to provide her thoughts as well, Dr. Williams cut her off and stopped her from talking.[28]

Plaintiff found Meyer's initial response to the key request "racially offensive."[29] Plaintiff also found Dr. Williams cutting her off "racially offensive" because Ricks was allowed to speak in the meeting.[30]

### C.  Incidents with Fraser

Plaintiff contends that her relationship with Fraser was "rocky" from the beginning.[31] Plaintiff asserts that Fraser treated her differently than Dr. Kaufman and Meyer. She testified, "I saw how [Fraser] treated [Meyer] and the things that she went to [Meyer] to talk about [sic] she would not come to me to talk about."[32] Similarly, Plaintiff would see how Fraser spoke with Dr. Kaufman and Payne and testified that she "wasn't treated the same way."[33] As an example, Plaintiff would ask Fraser to perform tasks, but Fraser would not do them.[34]

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.* at p. 5.
[30] *Id.* at p. 6.
[31] *Id.* at p. 9; Rec. Doc. No. 38-1, p. 4.
[32] *Id.* at p. 9-10, p. 4.
[33] *Id.* at p. 10, p. 4.
[34] *Id.*

In October and November 2019, Plaintiff requested that Fraser travel across the state to visit healthcare centers with Plaintiff and Payne.[35] Fraser told Plaintiff she did not want to go but never told Plaintiff why. Fraser agreed to go, but only after Plaintiff "beg[ged]" her to.[36] On the trip, Fraser did not bring her wallet and Plaintiff was required to pay for Fraser's expenses. However, Plaintiff admits the LCP reimbursed her for this.[37]

In another instance, Fraser took sick leave for five days. Upon her return from leave, Plaintiff requested that Fraser provide her with a doctor's note before approving her leave. Fraser informed Plaintiff that she did not have a doctor's note.[38] Fraser then told Plaintiff that Plaintiff could "fire her or pay for the doctor's visit to get the note."[39] Plaintiff dropped the issue and certified Fraser's time. Although the school's leave policy requires a doctor's note after ten or more days of consecutive sick leave, Plaintiff says she was told in a leadership meeting and by HR that a doctor's note was required after three or more days of consecutive sick leave.[40] Plaintiff brought up this incident in a management meeting, and Dr. Kaufman told her "staff do not like to be asked for verification and that's not how LCP runs things."[41]

Finally, Plaintiff contends that Meyer inappropriately inserted herself into Plaintiff's relationship with Fraser.[42] Plaintiff believed Fraser went to Meyer, and others, because of Plaintiff's race.[43] She told Meyer, "[f]irst of all, she's coming to you because we don't look

---

[35] *Id.*; Rec. Doc. No. 24-5, p. 35.
[36] *Id.*
[37] *Id.* at p. 36.
[38] *Id.* at p. 38.
[39] Rec. Doc. No. 24-1, p. 10.
[40] Rec. Doc. No. 24-16, Ex. J, p. 12; Rec. Doc. No. 38-1, p. 4.
[41] Rec. Doc. No. 24-1, p. 10.
[42] *Id.* at p. 11; Rec. Doc. No. 38-1, p. 4.
[43] *Id.* at p. 9; p. 4.

alike."[44] However, Plaintiff also admits that Fraser did not trust Plaintiff. Fraser believed that Plaintiff was blocking her from receiving a raise. Plaintiff admitted that this may have explained the lack of trust in their relationship.[45]

### D.  Incidents with Payne

Plaintiff supervised Payne until February 2020 when he was promoted to Evaluation Manager.[46] With this new position, Meyer began to supervise Payne. Payne began to split his time working on the grant with Plaintiff, working on a breast and cervical cancer grant with Meyer, and working on a comprehensive cancer grant with Giancola.[47] Payne was expected to split his time across these grant projects until July 1, 2020 or until someone was hired and trained to fill his prior position.[48]

In April or May 2020, Plaintiff noticed that Payne was not completing his responsibilities for the Colorectal Grant project.[49] As part of his tasks, Payne was required to send weekly COVID reports to his supervisor. These reports were "a snapshot of activities from his Outlook calendar for the week." Payne had routinely sent these reports to Plaintiff but on May 18, 2020, Plaintiff only sent his report to Meyer and Shanklin-Jackson.[50] This happened again on May 25 and June 1. On June 1, Plaintiff requested Payne send her his report.[51] After he did so, Plaintiff responded "[t]hank you. Please cc me on the e-mails as you did before for my record keeping purposes."[52] Payne responded with the following:

---

[44] *Id*. at p. 11; p. 4.
[45] *Id*.
[46] *Id*. at p. 11-12; p. 4.
[47] *Id*. at p. 11; p. 4.
[48] *Id*. at p. 11-12; p. 4.
[49] *Id*.at p. 12; p. 4.
[50] *Id*.
[51] *Id*. at p. 13; p. 4.
[52] Rec. Doc. No. 24-19, Ex. M.

I don't mind sharing them! You just may have to remind me.

I am curious though. Can you elaborate on your record keeping purposes? I'm unaware of other staff submitting these weekly reports to anyone other than their director supervisor and the Business Manager. My understanding was that [Shanklin-Jackson] was responsible for keeping these records on file. Also, I know that I provide frequent verbal reports and emailed updates on my CRC-related efforts throughout the week, so I'm unsure how these reports are helpful to you.[53]

The next day, Payne emailed Plaintiff and informed her that he was removing their weekly one-on-one meetings from the calendar. He explained that "his responsibilities [were] much greater than before," and he needed "the time to focus on task completion as well as [his] development as an evaluator and as a leader for [his] team."[54] Payne ended the email, stating, "[w]hile you may no longer be my supervisor, we remain close collaborators, peers, and partners in health systems change."[55]

Plaintiff forwarded Payne's emails to Dr. Kaufman,[56] and Dr. Kaufman agreed that Payne was not required to send Plaintiff his reports. Plaintiff disagreed with Dr. Kaufman, stating that she "need[ed] them for [her] records and also for productivity."[57] Dr. Kaufman responded, telling her that she did not need to explain herself to Payne and reminded Plaintiff that she was "almost done with him."[58] Plaintiff confirmed with Dr. Kaufman that she would let this issue go and Payne could "do what he wants."[59]

The next day, Dr. Kaufman encouraged Plaintiff to speak with Payne and suggested that she "model how to handle conflict or disagreement."[60] Plaintiff responded,

---

[53] *Id.*
[54] Rec. Doc. No. 24-20, Ex. N, p. 1.
[55] *Id.* at p. 2.
[56] Rec. Doc. No. 24-21, Ex. O, p. 3.
[57] *Id.*
[58] *Id.* at p. 2.
[59] *Id.*
[60] Rec. Doc. No. 24-22, Ex. P.

stating, "I am really disappointed in how this situation is being handled."[61] Again, Dr. Kaufman encouraged Plaintiff to speak with Payne to "see if it's just him or it's [her and Payne's] relationship."[62] She then suggested that Plaintiff speak with someone at the Campus Assistance Program ("CAP") for guidance on dealing with difficult colleagues. Dr. Kaufman told her this "[wasn't] a requirement, but it [was] a really good option."[63]

According to Plaintiff's testimony, she told Dr. Kaufman that she already made attempts to speak with him in their one-on-one meetings, but that Payne "didn't express anything."[64] Plaintiff did not want to "pry" if Payne did not want to share anything with her.[65]

Plaintiff also spoke with Meyer about Payne's emails. She told Meyer "there is a huge difference…between you and I. We look different. We are different."[66] On June 26, Meyer checked in with Plaintiff via email. She addressed the situation, explaining that she took Plaintiff's "concerns very seriously" and "willingly spent a great deal of time and emotional energy first understanding [Plaintiff's] concerns, then holding [Payne] accountable to his behavior."[67] However, Meyer explained that having conversations with Payne to hold him accountable almost cost Meyer and Payne their working relationship.[68] Consequently, she set a boundary with Plaintiff and wanted to leave Dr. Kaufman and Plaintiff to discuss her relationship with Payne going forward. She informed Plaintiff that

---

[61] Rec. Doc. No. 24-23, Ex. Q.
[62] *Id.*
[63] *Id.*
[64] Rec. Doc. No. 24-5, p. 7.
[65] *Id.*
[66] Rec. Doc. No. 24-1, p. 15; Rec. Doc. No. 38-1, p. 5.
[67] Rec. Doc. No. 38-9, p. 2.
[68] *Id.*

Payne garnered a new perspective on the emails and was "more self-aware."[69] She ended the email stating:

> I realize also that this situation didn't occur in a bubble, and that the ongoing conversations about racism w/o change are demoralizing both in the world at large and compounded within the workplace.[70]

Plaintiff admits that Payne was also promised a pay raise and believed that Plaintiff "had something to do with his not receiving a raise."[71] Notwithstanding this, Plaintiff believed that Payne's failure to complete his responsibilities and his emails were racially harassing and discriminatory.[72]

### E.  Issues with Plaintiff's Supervisors and Her Co-Managers

Over the course of her employment, Plaintiff claims that Dr. Williams and Dr. Kaufman made statements and took actions that were racially offensive. For example, in November 2019, Dr. Kaufman stated in a LCP leadership team meeting that they had an "implicit bias against African American people."[73] Then, on February 21, 2020, Dr. Kaufman emailed Dr. Williams, Plaintiff, and the other managers an article titled, "white supremacy culture."[74] The article provided a "list of characteristics of white supremacy culture that show up in [sic] organizations."[75] Dr. Kaufman wrote in her email, "Interesting read. I see [sic] our program and myself in this."[76] And when Dr. Kaufman suggested Plaintiff visit CAP to seek guidance on managing her subordinates, Dr. Kaufman became upset, called Plaintiff a "very angry person" but stopped herself from calling Plaintiff an

---

[69] *Id*.
[70] *Id*. at p. 3.
[71] Rec. Doc. No. 24-1, p. 16; Rec. Doc. No. 38-1, p. 5.
[72] *Id*. at p. 12, p. 13; p. 4-5.
[73] Rec. Doc. No. 38, p. 5.
[74] Rec. Doc. No. 38, p. 7.; Rec. Doc. No. 25-26, p. 2. The Court notes that this article is intentionally titled in lowercase.
[75] *Id*.
[76] *Id*. at p. 1.

"angry Black person."[77] She claims Dr. Williams had a "sharp tongue" geared towards Black employees and would "stare her down with a scowl on her face" in team Zoom meetings.[78]

Plaintiff also claims "off topic" conversations in team meetings were racially offensive. For example, after Meyer shared she had been arrested with her fellow co-workers, she asked Plaintiff if she had ever been arrested.[79] And after Dr. Williams and Meyer shared they have used marijuana, Meyer asked Plaintiff if she had ever smoked marijuana.[80] Finally, Plaintiff claims that Meyer was racially offensive towards her on other occasions. First, when Meyer suggested she supervise Hollingshed, Plaintiff asked Meyer if it was because they were both Black, and Meyer laughed and stated that she would be "a really good manager" for her.[81] Second, Meyer told Plaintiff that she did not want to manage Denise Johnson, an older Black employee, because she was "difficult."[82] Third, when Plaintiff spoke with Meyer about her termination, the two had discussed government assistance. Meyer brought up the option of Medicaid and obtaining food stamps.[83]

### F. Plaintiff's Termination

In or around August 2020, Dr. Kaufman announced that she would be reducing her work to part time and would be retiring in April 2021.[84] Around the same time, Dr. Reni Elewonibi ("Dr. Elewonibi"), a Black female, was hired at the LCP.[85] On August 11, 2020, Dr. Williams and Dr. Kaufman informed Plaintiff that her role was being eliminated

---

[77] Rec. Doc. No. 24-1, p. 18; Rec. Doc. No. 38-1, p. 6.
[78] *Id*. at p. 17; p. 6.
[79] *Id*. at p. 19; p. 7.
[80] *Id*.
[81] *Id*. at p. 20; p. 7.
[82] *Id*. at p. 21; p. 7.
[83] *Id*. at p. 19; p. 6.
[84] *Id*. at p. 21, 38-1, p. 7; Rec. Doc. No. 24-3, p. 41; Rec. Doc. No. 24-14, p. 5.
[85] *Id*.

as part of a decision to reorganize the LCP.[86] Dr. Williams and Dr. Kaufman decided to reorganize the LCP because the CDC funding of the Colorectal Grant had been reduced. In 2019, the grant was approximately $800,000, but when the grant was renewed in 2020, the grant was reduced to approximately $600,000.[87] By August, Plaintiff was only supervising Fraser. As such, Dr. Williams and Dr. Kaufman believed the Principal Investigator for the LCP could instead supervise Fraser, and there was no need for middle management.[88]

Dr. Elewonibi subsequently replaced Dr. Kaufman as the Principal Investigator and assumed Plaintiff's duties.[89] Plaintiff's position was functionally eliminated and is no longer on the LCP's organizational chart.[90]

Plaintiff filed a charge of discrimination with the EEOC on November 10, 2020.[91] On October 19, 2021, the EEOC provided Plaintiff with a Notice of Suit Rights.[92] On January 10, 2022, Plaintiff filed suit against Defendant alleging (1) discrimination on account of her race, (2) a hostile work environment, and (3) retaliation in violation of Title VII of the Civil Rights Act ("Title VII") and 42 U.S.C § 1981 ("Section 1981").[93] The Court now turns to consider Defendant's Motion for Summary Judgment.

---

[86] Rec. Doc. No. 24-1, p. 21; Rec. Doc. No. 38-1, p. 7; Rec. Doc. No. 24-14, p. 5.
[87] *Id*.
[88] Rec. Doc. No. 24-1, p. 22.
[89] *Id*.; Rec. Doc. No. 38-1, p. 8.
[90] *Id*.
[91] Rec. Doc No. 38-1, p. 14.
[92] Rec. Doc. No. 24-41, Ex. JJ.
[93] Rec. Doc. No. 1.

## II.   LAW AND ANALYSIS

### A.  Summary Judgment Standard

Summary Judgment should granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[94] The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[95] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[96] If the moving party "fails to meet this initial burden, the summary judgment must be denied, regardless of the nonmovant's response."[97]

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubts as to the facts, or a scintilla of evidence. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence

---

[94] *Basil v. Dow Chem. Co.*, No. CV 19-00004, 2020 WL 1964155, *1 (M.D. La. Apr. 23, 2020).
[95] *Id*.
[96] *Id*.
[97] *Id*.

of contradictory facts."[98] The Court will not, "in the absence of any proof assume that the nonmoving party could or would prove the necessary facts."[99] Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.

### B.  Title VII Race Discrimination-Termination

Plaintiff alleges that Defendant discriminated against her on the basis of her race in violation of Title VII and Section 1981. In order to survive Defendant's motion on her race discrimination claim, Plaintiff must establish that she is (1) "a member of a protected class"; (2) "was qualified for the position"; (3) "was subjected to an adverse employment action"; and (4) "other similarly situated persons were treated more favorably."[100] If Plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the Defendant to articulate legitimate, non-discriminatory reasons for the adverse actions taken against her.[101] If Defendant satisfies this burden of production, the burden shifts back to Plaintiff, who must "offer sufficient evidence to create a genuine issue of material fact 'either 1) that [Defendant's] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [Defendant's] reason, while true, is only one of the reasons for its conduct, and another motivating factor is [Plaintiff's] protected characteristic (mixed-motive[s] alternative).'"[102]

---

[98] *Id*. at *2.
[99] *Id*.
[100] *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005); *See also Harris v. Lab. Finders Int'l, Inc.*, No. CV 17-692-SDD-EWD, 2019 WL 407396, n. 27 (M.D. La. Jan. 31, 2019) ("To the extent Plaintiff has brought a claim under 42 U.S.C. § 1981, the same standard applies for Title VII and Section 1981 claims of discrimination and retaliation." (citing *Brandon v. Sage Corp.*, 808 F.3d 266 (5th Cir. 2015)).
[101] *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).
[102] *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (citing same in the context of a Title VII race discrimination case).

"The law is clear that '[i]n the context of a race discrimination claim where the plaintiff alleges that employees who were not members of the protected class receive more [favorable treatment], the plaintiff must come forward with **specific evidence** of comparators who were similarly situated."[103]

Courts within the Fifth Circuit define "similarly situated" narrowly.[104] In evaluating whether an alleged comparator is similarly situated, "[t]he employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, share the same supervisor [,] or had their employment status determined by the same person[.]"[105] "Employees with different supervisors, who work for different divisions of a company…generally will not be deemed similarly situated." The Fifth Circuit has further explained that, "employees who have different work responsibilities…are not similarly situated."[106]

There is no dispute that Plaintiff can establish a *prima facie* case of discrimination under Title VII and Section 1981—she is Black, held solid performance reviews, and was terminated from her role. Additionally, Plaintiff has offered evidence that she was "similarly situated" to Meyer, who is White and was also a program manager in the LCP

---

[103] *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Mgmt*, 816 F.Supp.2d 297, 316 (M.D. La. 2011) (citing *Lee*, 574 F.3d 253, 259–60 (5th Cir. 2009)) (emphasis added).

[104] *See Horton v. G4S Secure Solutions (USA), Inc*., No. 16-544-SDD-EWD, 2018 WL 1997535 at *5 (M.D. La Apr. 27, 2018) (citing *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist*., 871 F.Supp.2d 581, 593 (S.D. Tex. 2012; *see also Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 856-57 (S.D. Tex. 2010)).

[105] *Id*. (quoting *Turner v. Kansas City S. Ry. Co*., 675 F.3d 887, 893 (5th Cir. 2012) (quoting *Lee,* 574 F.3d 253, 260 (5th Cir. 2009))).

[106] *Id*. (quoting *Lee*, 574 F.3d at 259) (citing *Wyvill v. United Cos. Life Ins.,* 212 F.3d 296, 302 (5th Cir. 2000)).

and on the "same level" as Plaintiff.[107] Furthermore, Meyer and Plaintiff both supervised Payne throughout Plaintiff's employment.[108]

Nevertheless, Defendant has proffered a legitimate, non-discriminatory reason for her termination. Defendant offered evidence that Plaintiff was terminated because (1) the Colorectal Grant funding Plaintiff's position was reduced by $200,000 and (2) Plaintiff's position created an "an unnecessary layer of middle management" with Dr. Kaufman's intent to retire and the hiring of Dr. Elewonibi.[109] Around the time of the termination, Plaintiff was supervising only one employee (Fraser), and Dr. Elewonibi could assume the duties of Plaintiff and Dr. Kaufman.[110] Defendant believed that consolidating the positions would result in cost saving.[111] Plaintiff admits that although Dr. Kaufman did not intend to retire until the following April, Dr. Kaufman was going to reduce her work schedule immediately.[112]

Because Defendant has proffered a legitimate, non-discriminatory reason, Plaintiff is required to provide evidence that suggests this reason is pretext. "[P]laintiff may establish pretext by showing a discriminatory motive more likely motivated her employer's decisions, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence."[113]

Plaintiff argues that Defendant basing her termination on restructuring LCP is mere pretext for discrimination because after the CDC grant amount was reduced, the LCP

---

[107] Rec. Doc. No. 24-1, p. 3; Rec. Doc. No. 38-1, p. 1.
[108] Rec. Doc. No. 24-1, p. 11; Rec. Doc. No. 38-1, p. 4.
[109] Rec. Doc. No. 24-2, 14.
[110] *Id*.
[111] *Id*.
[112] Rec. Doc. No. 24-3, p. 41.
[113] *Irving v. Georgia-Pac. Corp.*, No. CV 18-932-SDD-EWD, 2021 WL 2447230, *7 (M.D. La. June 15, 2021).

management considered the program's budget and the CDC approved Plaintiff's salary for this position. Moreover, Plaintiff argues that upon notice of her termination, Dr. Kaufman and Dr. Williams told the other LCP managers that "if anyone asks what happened to [Plaintiff], the team was to say '[w]e're restructuring.'"[114] Ms. Shanklin-Jackson testified in her deposition that while they were told they were restructuring it was a "lie."[115] Plaintiff contends that this directive "indicates that a 'restructuring' was not the true reason for her termination."[116]

Plaintiff also asserts the following facts as circumstantial evidence to show pretext: employees did not trust her; Plaintiff and Hollingshed were not "trusted to have keys to a room holding expensive equipment"; her co-workers "labeling African American employees [as] 'difficult'"; her supervisors sharing their implicit bias against Black people; her supervisor circulating the article on white supremacy culture; Dr. Kaufman calling Plaintiff an "angry black woman;" and the proximity between her complaints to CAP and her termination.[117]

While Plaintiff contends that Dr. Kaufman called her an "angry black woman,"[118] she also testified that Dr. Kaufman did not say this precisely; she said "you are an angry— and [Dr. Kaufman] started to say the word black, and then she stopped herself."[119] Although Plaintiff asserts employees did not trust her, she also admits that her

---

[114] Rec. Doc. No. 38, p. 21.
[115] Rec. Doc. No. 38-5, Ex. 4, p. 72-73.
[116] Rec. Doc. No. 38, p. 21.
[117] Rec. Doc. No. 38, p. 24. The Court notes that Plaintiff provides the proximity between her complaints to CAP and her termination as circumstantial evidence of pretext. This refers to the temporal proximity between Plaintiff's alleged protected activity and her termination. Thus, this fact is better suited to be addressed in the context of a Title VII retaliation claim, not a Title VII discrimination claim. As such, the Court will address this issue in Section D of this Ruling.
[118] Rec. Doc. No. 38, p. 11.
[119] Rec. Doc. No. 24-6, Ex. A, p. 10.

subordinates, Payne and Fraser, may have lacked trust because they believed that Plaintiff was obstructing their ability to get a raise.[120] Therefore, Plaintiff's own deposition testimony undermines her argument that racial animus motivated the conduct of which she complains.

Plaintiff also asserts that, under Fifth Circuit precedent, she is not required to show she was replaced by someone outside of her protected class. While true, this does not render the race of her replacement irrelevant on the issue of pretext. The Fifth Circuit has acknowledged that "the circuit cases reflect some uncertainty regarding this requirement."[121] Moreover, notwithstanding the issue of whether it is required to make Plaintiff's case, being replaced by someone of the same racial class "is certainly material to the question of discriminatory intent."[122] Thus, while the LCP's hiring of Dr. Elewonibi, a Black female, is not dispositive, this action cuts against an inference of discrimination.

Finally, the parties disagree on whether the "same actor" inference applies to this case. The "same actor" inference creates a rebuttable presumption that an adverse action imposed on a plaintiff was not the result of unlawful discrimination when the same person both hires and fires or imposes some other adverse action on the plaintiff.[123] Given that Dr. Williams and Dr. Kaufman hired and then terminated Plaintiff, the Court agrees with Defendant that the "same actor" inference applies. Nevertheless, the Fifth Circuit has "decline[d] to establish a rule that no inference of discrimination could arise under such

---

[120] Rec. Doc. No. 24-1, p. 11, 16; Rec. Doc. No. 38-1, p. 5.
[121] *Mangum v. Stan Trans, Inc.,* 204 F.3d 1114, n.1 (5th Cir. 1999).
[122] *See Nieto v. L&H Packing Co.,* 108 F.3d 621, 624 (5th Cir. 1997) (concluding that while being replaced by someone of the same racial class is "not outcome determinative, this fact is certainly material to the question of discriminatory intent").
[123] *Williams v. Louisiana*, No. CV 14-00154-BAJ-RLB, 2015 WL 5318945 (M.D. La. Sept. 11, 2015) (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir.1996) (abrogated in part on other grounds, *Russell v. McKinney Hosp. Venture,* 235 F.3d 219 (5th Cir.2000)); *Trevino v. City of Fort Worth*, No. 4:12–CV–717–A, 2013 WL 4516643, at *7 (N.D.Tex. Aug. 23, 2013).

circumstances."[124] In other words, the "same actor" inference is neither mandatory nor irrebuttable. But, if "the non-moving party has otherwise failed to raise a genuine dispute as to a material fact, the 'same actor' inference simply reinforces [sic] [D]efendant's submission with respect to [Plaintiff's] race discrimination claim."[125]

Considering the entire record, the Court finds that Plaintiff has failed to raise a genuine issue of material fact as to Defendant's proffered legitimate, non-discriminatory reason. There is no summary judgment evidence before the Court challenging the facts that around the time of Plaintiff's termination, Dr. Kaufman announced that she was reducing her work schedule to part time and Dr. Kaufman announced her pending retirement, or that Plaintiff's supervisory role was limited to one person. To the contrary, Plaintiff's own deposition testimony confirmed these facts. Defendant has maintained that the reason for Plaintiff's termination was a business decision. It is not the Court's role to second-guess the business decisions of employers, and the Court will not do so in this matter.[126] Furthermore, the circumstantial evidence presented by Plaintiff does not raise any genuine issues of material fact as to whether her termination was motivated by racial animus. Plaintiff's "circumstantial evidence" is largely based on her own subjective belief that her colleagues' conduct was racially discriminatory.[127] This is insufficient to create a

---

[124] *Haun v. Ideal Indus., Inc.*, 81 F.3d 54, 546 (5th Cir. 1996).

[125] *Jones v. Wells Fargo Bank, N.A.,* No. CV 17-8712, 2019 WL 4601602, *12 (E.D. La. Sept. 23, 2019).

[126] *See Nathan v. PNK (Baton Rouge) P'ship*, No. CV 17-118-SDD-RLB, 2018 WL 6005422, *10 (M.D. La. Nov. 14, 2018) ("[t]he Fifth Circuit cautions that courts are not in the business of second guessing business judgments") (citing *Walton v. Bisco Indus. Inc.,* 119 F.3d 368, 372 (5th Cir. 1997)).

[127] *See Salinas v. AT&T Corp.,* 314 F. App'x 696 (5th Cir. 2009) (granting summary judgment because Plaintiff's supported his claim solely on his subjective belief that "he was the victim of unlawful discrimination); *See also Harris.*, No. CV 17-692-SDD-EWD, 2019 WL 407396 (M.D. La. Jan. 31, 2019) (finding that the plaintiff presented no evidence of negative statements or criticism toward his religious beliefs and the plaintiff's reliance on his subjective belief of religious discrimination insufficient to overcome summary judgment); *Nichols v. Lewis Grocer*, 138 F.3d 563, 570 (5th Cir. 1998) (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 96 (5th Cir. 1991) ) ("[A] subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief.") (*alteration in original* ); *Cavalier v. Clearlake Rehab. Hosp., Inc.*, 306 Fed.Appx. 104, 107 (5th Cir. 2009) ("Though [the plaintiff] may believe that all twelve incidents were

factual dispute over pretext. Consequently, Defendant's motion will be granted on Plaintiff's race-discrimination claim.

### C. Title VII Hostile Work Environment

Plaintiff alleges that she suffered a hostile work environment while working as a Program Manager in the LCP. To survive Defendant's motion, Plaintiff must show "(1) she belongs to a protected class; (2) she was subject[ed] to unwelcome harassment; (3) the harassment was based on [a protected characteristic]; and (4) the harassment affected a 'term, condition, or privilege' of employment."[128] Harassment affects a "term, condition, or privilege" of employment when it is so severe or pervasive that it alters the conditions of employment and "create[s] an abusive work environment."[129] The Court must consider "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[130]

"Critically, Title VII is not a 'general civility code.'"[131] Plaintiff must show that the conduct of which she complained occurred because of her race.[132] Plaintiff's subjective

---

[128] *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 453 (5th Cir. 2013) (quoting *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.,* 512 F.3d 157, 162–63 (5th Cir. 2007)).

[129] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).

[130] *Moore v. United Parcel Serv., Inc.,* 150 Fed.Appx. 315, 319 (5th Cir. 2005) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

[131] *Heath v. Southern University System Foundation*, 2017 WL 2972909 at *5 (quoting *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81 (1998)) (explaining that the elements of a hostile work environment claim "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"); *Clark v. S. Broward Hosp. Dist.*, 601 Fed.Appx. 886, 900 (11th Cir. 2015) (quoting *Cotton v. Cracker Barrel Old Country Store, Inc.,* 434 F.3d 1227, 1234 (11th Cir. 2006)) ("Title VII is not a 'general civility code' and does not make 'ordinary [workplace] tribulations' actionable, so not all objectionable language and conduct will support a Title VII harassment claim.") (alteration in original); *Reine v. Honeywell Int'l Inc*., 362 Fed.Appx. 395, 397–98 (5th Cir. 2010) ("This high standard for judging hostility is specifically intended to prevent Title VII from becoming a 'general civility code' for the workplace.").

[132] *See Hervey v. Cty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008) (quoting *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005)) ("Even if we assume that [the defendant's] actions were abusive,

---

motivated by racial animus, subjective belief of racial motivation, without more, is not sufficient to show a hostile work environment.").

belief that alleged harassment occurred because of a protected characteristic is insufficient.[133]

The Court ascertains from Plaintiff's pleadings that she was subjected to harassment based on the following alleged conduct: her supervisor's responses to conflict between Plaintiff and her subordinates; her supervisor requiring Plaintiff to share budgetary information with her subordinates; her supervisor circulating an article on white supremacy culture; her supervisors stating they had an implicit bias against African American people; her supervisor stating that Ricks was "racist"; Marmer refusing to give her a key to access her office; Meyer suggesting that she supervise Hollingshed; Meyer asking if she had ever been arrested; Meyer asking her if she had ever smoked marijuana; and Dr. Williams cutting her off in a leadership meeting.[134] Taken in totality, these allegations do not rise to the level of severity and pervasiveness required under Title VII.[135]

Plaintiff contends Meyer's statements to her about Medicaid and food stamps were racially offensive. Plaintiff recorded this conversation with Meyer, and Defendant

---

[the plaintiff] must 'prove that she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior.'").

[133] *Cavalier,* 306 Fed.Appx. 104, 107 (5th Cir. 2009) ("Though [the plaintiff] may believe that all twelve incidents were motivated by racial animus, subjective belief of racial motivation, without more, is not sufficient to show a hostile work environment."); *Nichols,* 138 F.3d 563, 570 (5th Cir. 1998) (quoting *Little,* 924 F.2d 93, 96 (5th Cir. 1991)) ("[A] subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief.") (alteration in original).

[134] Rec. Doc. No. 38, p. 18.

[135] *See Harris v. Drax Biomass Inc.,* 813 F. App'x 945, 949 (5th Cir. 2020) (affirmed failure to satisfy a hostile work environment claim where the plaintiff alleged that his supervisor yelled at him, failed to provide him with training, overheard a comment where his supervisor "indicat[ed] that a monkey could do that employee's job" and his supervisor would break up groups of African American employees who were waiting for work to begin but not groups of white employees.); *See also Andrews v. Louisiana State Univ.,* No. CV 16-846-SDD-EWD, 2018 WL 4259248 (M.D. La. Sept. 6, 2018) (finding lack of severity when no racial epithets were used against the plaintiff or anyone else); *See also West v. City of Houston,* Texas, 960 F.3d 736 (5th Cir. 2020) (finding that "[making] the occasional racially insensitive joke", "colleagues [being] sometimes offensive and boorish"; male colleagues sleeping in underwear at the fire station (the workplace) and bringing adult magazines to the fire station insufficient to satisfy a hostile work environment claim).

submitted the audio recording[136] with its motion. In the recording, Plaintiff discussed next steps following her termination and said, "I need to figure out how to apply for that and how that works…I need to do some reading up on that and eligibility criteria and all that other stuff…"[137] ostensibly referencing what government aid was available to her. In response, Meyer asked if she could get on Medicaid and then stated, "my mom is on food stamps."[138] In the same recording, Meyer offered to provide Plaintiff with a reference and assist her with moving. Even if Plaintiff was offended by Meyer's remarks, there is no dispute that this allegation does not rise to the level of severity required to satisfy a hostile work environment claim.

Plaintiff also alleges that Shanklin-Jackson was called the "n-word."[139] This accusation falls under the "Stray Remarks" Doctrine. The Fifth Circuit has held that under this doctrine, a workplace slur does not provide sufficient evidence of discrimination unless it is related to Plaintiff's protected class, proximate in time to the adverse employment decision, made by an individual with authority over Plaintiff, and related to

---

[136] The Court recognizes that the recording must be authenticated to be admissible. However, the Fifth Circuit has instructed the Court that content of otherwise inadmissible materials can be considered on summary judgment if there is a showing that it is a possible for the information to be put into an admissible form. *See Lee v. Offshore Logistical & Transp.*, L.L.C., 859 F.3d 353, 355 (5th Cir. 2017), as revised (July 5, 2017) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible ..., the material may be presented in a form that would not, in itself, be admissible at trial.") (citing 11 MOORE'S FEDERAL PRACTICE–CIVIL ¶ 56.91 (2017); *see also* Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016) (holding that a "proponent need only 'explain the admissible form that is anticipated' " (quoting FED. R. CIV. P. 56, advisory committee's note to 2010 amendment)); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (recognizing that a "court may consider ... the content or substance of otherwise inadmissible materials where the 'the party submitting the evidence show[s] that it will be possible to put the information ... into an admissible form.' " (alteration in original) (quoting 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE–CIVIL ¶ 56.91[2] (3d ed. 2015))); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (determining that a district court may consider a statement "if the statement could be reduced to admissible evidence at trial or reduced to admissible form." (citation omitted)). There is no dispute that Plaintiff recorded her colleagues, and both parties rely on the recording in their briefs.

[137] Rec. Doc. No. 24-34, Ex. BB.

[138] *Id*.

[139] Rec. Doc. No. 39, p. 18.

the employment decision at issue.[140] Plaintiff cannot rely on this allegation to raise a genuine issue of material fact. Shanklin-Jackson testified that the alleged incident occurred in 2016 and did not involve any of the employees Plaintiff alleges harassed her.[141] Not only is this not proximate in time to Plaintiff's allegations, but also the alleged incident did not involve anyone with authority over Plaintiff. Additionally, Plaintiff alleges that in January 2020, an unnamed Black employee was "not properly compensated."[142] However, no summary judgment evidence is available to the Court to address whether Plaintiff and the alleged employee were similarly situated. Further, "anecdotes about other employees cannot establish that discrimination was a company's standard operating procedure unless those employees are similarly situated to the plaintiff."[143] Plaintiff has not alleged that she personally experienced the conduct complained of here, and these allegations fail to raise any genuine issues of material fact as a matter of law.

Finally, Plaintiff relies on several anonymous responses to a February 2020 climate survey to support her hostile work environment claim. Some of the survey responses include: "witness[ing] many microaggressions against black people"; "[w]hite employees are treated more favorably"; and fears of retaliation for filing complaints.[144] In response, Defendant cites *Crumpacker v. Kansas Dept. of Human Resources*, in which the District of Kansas excluded an employer's anonymous climate survey from evidence because "the court [was] at a loss to see how this evidence could possibly be admissible."[145] Similarly, the Court cannot reason how the survey is "competent opposing

---

[140] *Irving,* No. CV 18-932-SDD-EWD, 2021 WL 2447230 at *9 (M.D. La. June 15, 2021) (discussing *Patel v. Midland Memorial Hospital & Medical Center*).
[141] Rec. Doc. No. 38-7, p. 4, p. 10.
[142] Rec. Doc. No. 38, p. 6.
[143] *Wyvill*, 212 F.3d 296, 302 (5th Cir. 2000).
[144] Rec. Doc. No. 38, p. 6.
[145] 2004 WL 1846146 at *4 (D. Kan. 2004).

evidence" because it is anonymous hearsay. Additionally, assuming *arguendo* that the survey was competent summary judgment evidence, the Court finds that the responses to the climate survey do not raise any genuine issue of material fact because they are unsubstantiated assertions.[146] When reviewing the entire survey, several of the grievances do not trigger Title VII, and none of the comments mention any use of racial epithets or slurs. Furthermore, because the survey responses are anonymous, they do not constitute summary judgment evidence and fail to demonstrate any relevance to this particular Plaintiff or other similarly situated employees. When viewing this evidence in the light that most favors Plaintiff, Plaintiff has failed to raise any issues of fact to overcome Defendant's summary judgment motion. As such, the Court will grant the motion on Plaintiff's hostile work environment claim.

### D. Title VII Retaliation

Plaintiff asserts that her termination was retaliation for reporting discrimination to CAP, her direct supervisor, and her co-workers. To establish a *prima facie* case of retaliation under Title VII and Section 1981, Plaintiff must establish that (1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action.[147]

---

[146] *See Lee*, 859 F.3d 353 at 355 (5th Cir. 2017), as revised (July 5, 2017) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible ..., the material may be presented in a form that would not, in itself, be admissible at trial.").

[147] *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007); *See Harris*, No. CV 17-692-SDD-EWD, 2019 WL 407396, n. 27 (M.D. La. Jan. 31, 2019).

There is no dispute an adverse action was taken against Plaintiff. However, the parties disagree over whether Plaintiff engaged in protected activity to satisfy the first prong of her claim.

An employee engages in activity protected by Title VII when the employee has "opposed any practice made an unlawful employment practice" by Title VII or "made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing" under Title VII.[148] The Supreme Court has explained that, to demonstrate retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[149] Furthermore, "opposing" a practice "only constitutes protected activity if the employer had some notice of both the employee's opposition and the discriminatory nature of the conduct being opposed."[150] Filing an internal complaint can also constitute protected activity. However, "while opposition to discrimination need not be in formal writing, internal complaints must reference discrimination or other unlawful employment activity in order to be protected."[151] Additionally, "[m]agic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue."[152]

Plaintiff testified that she complained to Dr. Kaufman and Meyer that Fraser and Payne treated her differently than they did Meyer and Dr. Kaufman because they "looked

---

[148] 42 U.S.C. § 2000e–3(a); *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).
[149] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, (2006) (citations omitted).
[150] *Henderson v. Bd. of Supervisors of S. Univ. & A&M Coll.*, No. CV 21-297-JWD-RLB, 2023 WL 2614620 (M.D. La. Mar. 23, 2023).
[151] *Allen v. Johnson*, No. CIV.A. 13-503-JWDSCR, 2014 WL 7334901 (M.D. La. Dec. 19, 2014) (citing *Rodriquez v. Wal–Mart Stores, Inc.,* 540 Fed. Appx. 322 (5th Cir.2001)).
[152] *Brown v. United Parcel Serv., Inc.,* 406 F. App'x 837 (5th Cir. 2010).

different."[153] Plaintiff also testified that she told Employee Relations and CAP counselor Scott Embley the same. Plaintiff contends that Employee Relations wanted to investigate the matter, but the school declined to move forward with the investigation.[154] Defendant rejects this allegation, stating that it was Plaintiff that refused to move forward with the investigation.[155] Although, the summary judgment evidence does not indicate that Plaintiff explicitly mentioned her race or ethnicity when making her complaints, there is no dispute that she complained on multiple occasions such that her employer was alerted to her beliefs of discrimination.

Plaintiff relies on the temporal proximity between her complaints and her termination to show a causal connection between her protected activity and her termination. She alleges that she complained to Employee Relations from June 2020 through September 2020, and she learned of her termination on August 11, 2020.[156] Her official last day was September 10, 2020.[157] The Fifth Circuit has held that "temporal proximity between protected activity and alleged retaliation is sometimes enough to establish causation at the prima facie stage."[158] However, "the protected act and the adverse employment action [must be] 'very close' in time to establish causation by timing alone."[159] The Fifth Circuit has found various lengths of time to be acceptable to establish causation, and in some circumstances less time than alleged by Plaintiff.[160] As such, a

---

[153] Rec. Doc. No. 24-1, p. 23; Rec. Doc. No. 38-1, p. 8.
[154] Rec. Doc. No. 38, p. 12.
[155] Rec. Doc. No. 24-1, p. 24; Rec. Doc. No. 41-1, p. 7.
[156] Rec. Doc. No. 38, p.12, 26.
[157] Rec. Doc. No. 24-1, 1.
[158] *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948 (5th Cir. 2015).
[159] *Id*.
[160] *See Id*. (finding a six and a half week gap to be acceptable and citing numerous Circuit cases where the Fifth Circuit has found seven weeks, two and half months, or in some circumstances four months to be acceptable to establish causation).

gap of two and half months between Plaintiff's complaint and her termination is sufficient to satisfy causation. Consequently, there is no dispute that Plaintiff can establish her *prima facie* case of retaliation.[161]

However, Defendant has presented a legitimate, non-retaliatory reason for terminating Plaintiff. Defendant maintains that Plaintiff's termination was the result of the LCP restructuring following the reduction in the Colorectal Grant, Dr. Kaufman's pending retirement, as well Dr. Elewonibi's hiring. Defendant contends that consolidating Plaintiff's and Dr. Kaufman's role into one role that Dr. Elewonibi could undertake made sense, especially so because only Fraser worked under Plaintiff. Because this is a legitimate, non-retaliatory reason for Plaintiff's termination, the burden shifts to Plaintiff to demonstrate that this proffered reason is mere pretext for unlawful retaliation.

"A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence."[162] Ultimately, in order to survive a summary judgment, a plaintiff must show "a 'conflict in substantial evidence'" on the question of whether the employer would not have taken the adverse employment action but for the protected activity.[163] In her Opposition, Plaintiff addresses her *prima facie* case, but fails to address whether Defendant's proffered legitimate, non-retaliatory reason is pretext for unlawful retaliation . The Court noted in Footnote 113 that Plaintiff's temporal proximity argument was better suited to establish her retaliation claim

---

[161] *See Rosette v. PNK (Baton Rouge) P'ship,* No. CV 17-00015-BAJ-EWD, 2018 WL 3041190 (M.D. La. June 19, 2018) (finding that a four-month period between the plaintiff filing a charge and her termination established causation at the summary judgment stage).

[162] *Bracken v. Welborn,* No. CV 20-72-SDD-EWD, 2021 WL 2980214 (M.D. La. July 14, 2021) (citing *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013)).

[163] *Id.* (Citing *Musser v. Paul Quinn Coll.,* 944 F.3d 557, 561 (5th Cir. 2019) (quoting *Hernandez v. Yellow Transp.,* Inc., 670 F.3d 644, 658 (5th Cir. 2012)).

but she also fails to mention this as evidence of pretext in the retaliation section of her Opposition.

However, assuming *arguendo*, that Plaintiff attempts to satisfy a showing of pretext in the same manner as she did for her race discrimination claim, the Court finds that Plaintiff fails to raise any issue of material fact with respect to Defendant's proferred legitimate, non-retaliatory reason. Defendant maintains that both the non-discriminatory and non-retaliatory reason for her termination was the restructuring. As mentioned, when analyzing pretext, the Court is not to engage in second-guessing an employer's business decision.[164] There is no summary judgment evidence before the Court that challenges the personnel changes that were related to the restructuring. And while temporal proximity between her complaints to Employee Relations and her termination can establish causation, this alone is insufficient to show pretext and allow a reasonable juror to conclude from the summary judgment evidence that she would not have been terminated "but for" her complaints.[165]

---

[164] *See Nathan*, No. CV 17-118-SDD-RLB, 2018 WL 6005422, *10 (M.D. La. Nov. 14, 2018) ("[t]he Fifth Circuit cautions that courts are not in the business of second guessing business judgments") (citing *Walton v. Bisco Indus. Inc.,* 119 F.3d 368, 372 (5th Cir. 1997)).

[165] *See Hawkins v. Avalon Hotel Grp.*, LLC, 986 F. Supp. 2d 711, 725 (M.D. La. 2013) (finding the plaintiff's subjective belief of retaliation and temporal proximity by themselves were insufficient to show the defendant's proffered legitimate, non-retaliatory reason for her termination was pretext).

## III.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment[166] is hereby **GRANTED**. Plaintiff's claims are dismissed with prejudice. The Pre-Trial Conference set for January 16, 2024 and the Jury Trial set to begin, January 29, 2024, are hereby canceled.[167]

Signed in Baton Rouge, Louisiana, on this ___20th___ Day, December, 2023.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[166] Rec. Doc. No. 24.
[167] *See* Rec. Doc. Nos. 45 and 21.